Thomas S. Biemer, Esquire
Katharine Hartman, Esquire
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: 215-575-7000
Fax: 215-575-7200
tbiemer@dilworthlaw.com
khartman@dilworthlaw.com

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | | |
|---|---|---|
| ENTRY POINT COMMUNICATIONS, LLC | : | CIVIL ACTION NO. |
| Plaintiff, | : | JURY TRIAL DEMANDED |
| v. | : | |
| BI-LO HOLDING, LLC, a/k/a BI-LO HOLDINGS, LLC; BI-LO, LLC; WINN-DIXIE STORES, INC.; AND J.H. HARVEY CO., LLC | : | |
| Defendants. | : | **Electronically Filed** |

# COMPLAINT

Plaintiff Entry Point Communications, LLC ("EPC" or "Plaintiff"), by its attorneys, for its Complaint against Bi-Lo Holding, LLC a/k/a Bi-Lo Holdings, LLC ("BLH"), Bi-LO, LLC, Winn-Dixie Stores, Inc. ("Winn-Dixie"), and J.H. Harvey Co., LLC ("Harvey's") (collectively, "BI-LO" or "Defendants") (BI-LO and EPC are collectively referred to herein as the "Parties"), avers as follows:

## NATURE OF ACTION

1. EPC is an in-store marketing media company that focuses on grocery store retail chains. EPC's principal business involves a proprietary marketing and promotion system that

distributes personalized offers and messages to shoppers inside retail stores (referred to herein as the "Program").

2.      EPC brings this Complaint for damages arising out of, *inter alia*, Defendants' material breach of their agreement to participate in EPC's Program in their stores, which program is named "myDEALS" ("myDEALS" or "myDEALS Program").

3.      In April 2013, Winn-Dixie entered into a written Phase 1 License Agreement with EPC to rollout EPC's myDEALS's Program in all of Winn-Dixie's stores, so long as EPC met certain performance criteria (the "Performance Criteria") during an initial 90-day pilot phase of the myDEALS Program ("Phase 1").

4.      The Program pilot was executed in eleven (11) stores by EPC, per the Phase 1 License Agreement, between August and October 2013.

5.      EPC met the Performance Criteria.

6.      In October 2013, Defendants informed EPC that Defendants had approved a chainwide rollout of myDEALS into Winn-Dixie stores, into Harvey's stores (which BLH had acquired subsequent to April 2013) and into Bi-LO stores, also owned by BLH (the "Chainwide Rollout").

7.      At this time, the Parties entered into an oral modification of the written Phase 1 License Agreement by enlarging the scope of the Rollout Agreement to include Bi-LO and Harvey's stores.   [The aforementioned April 2013 Phase 1 License Agreement and the subsequent oral modification are collectively referred to herein as the "License Agreement".]

8.      The Defendants repeatedly discussed the timing of the Chainwide Rollout with EPC for months afterwards and requested EPC to install the myDEALS Program into specific additional stores beyond the scope of Phase 1, including into Bi-LO and Harvey's stores.

9. Subsequently, however, EPC was informed that Defendants no longer intended to follow through with the rollout of myDEALS. The License Agreement is explicit that the Parties are legally bound to enter into a Rollout Agreement so long as the Performance Criteria are met. Nevertheless, Defendants refuse to enter into the Rollout Agreement with EPC in material breach of the License Agreement.

## THE PARTIES

10. Plaintiff, EPC, is a Delaware limited liability company with its principal place of business at 3705 Quakerbridge Road, Suite 110, Hamilton, New Jersey 08619.

11. The citizenship of EPC's members is as follows:

a. FLOORgraphics, Inc. is a Pennsylvania corporation with its principal place of business at 3705 Quakerbridge Road, Suite 110, Hamilton, New Jersey 08619.

b. TRS Holding, Inc. is a Delaware corporation with its principal place of business at 15 Lewis Street, Suite 300, Hartford Connecticut 06103.

12. Upon information and belief, BLH is a Delaware limited liability company with a principal place of business located at 5050 Edgewood Court, Jacksonville, Florida 32254-3601. Upon information and belief, BLH is the parent company of Bi-LO, LLC, Harvey's and Winn-Dixie.

13. Upon information and belief, Bi-LO, LLC, is a Delaware limited liability company with a principal place of business located at 208 Bi Lo Boulevard., Greenville, South Carolina 29607. Upon information and belief, Bi-LO, LLC owns the chain of Bi-LO branded grocery stores.

14. Upon information and belief, Harvey's is a Georgia limited liability company with a principal place of business located at 107 South Davis Street, Nashville, Georgia 31639. Upon information and belief, Harvey's owns the chain of Harvey's branded grocery stores.

15. Upon information and belief, the members of BLH, Bi-LO, LLC, and Harvey's are collectively citizens of Florida, Illinois, Louisiana, South Carolina and Virginia.

16. Upon information and belief, none of the members of BLH, Bi-LO, LLC, or Harvey's is a citizen of New Jersey, Pennsylvania, Delaware or Connecticut.

17. Winn-Dixie is a Florida corporation with a principal place of business located at 5050 Edgewood Court, Jacksonville, Florida 32254-3601. Upon information and belief, Winn-Dixie owns the chain of Winn-Dixie branded grocery stores.

**JURISDICTION AND VENUE**

18. Jurisdiction is proper under 28 U.S.C. § 1332(a)(1) by reason of diversity of citizenship of the Parties, because Defendants are citizens of Florida, Illinois, Louisiana, South Carolina and Virginia, and EPC is a limited liability company whose members are citizens of states other than Florida, Illinois, Louisiana, South Carolina and Virginia, and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.

19. Venue is proper in the Court under 28 U.S.C. § 1391(b), because Defendants conduct business and are subject to personal jurisdiction in this judicial district. In addition, a substantial part of the events giving rise to the claims occurred in Hamilton, New Jersey, which is located within the District of New Jersey.

20. Trial is proper in the vicinage of Trenton pursuant to Local Court Rule 40.1 inasmuch as the alleged conduct that forms the subject matter of this action occurred in Hamilton, New Jersey.

## FACTUAL BACKGROUND

### A.    EPC's myDEALS Program

21.    EPC's Program utilizes data mining and targeting technology applied to transaction and other data to create personalized offers for each loyalty-card holding household of a retailer on behalf of advertisers and participating retailers.

22.    The Program distributes the offers and messages through multiple consumer touch points (mobile/smart phones; PDA's; email; retailer's website; direct mail) and through kiosks located near the store entry ("Activation Stations").  These Activation Stations, which cost thousands of dollars each, attract high shopper participation rates by making it easy for shoppers to receive personalized offers and messages as they start to shop, resulting in high offer redemption rates.

23.    EPC generates revenue by soliciting consumer packaged goods manufacturers ("CPGs") (manufacturers of branded and packaged foods and of packaged non-food products [paper towels, cleaning products, personal care items, etc.] sold in stores including grocery) to pay EPC to distribute promotional offers on their products to shoppers in retail stores which participate in EPC's Program.

### B.    The Phase 1 License Agreement

24.    On or about April 23, 2013, EPC and Winn-Dixie entered into the aforementioned Phase 1 License Agreement in which Winn-Dixie agreed to, *inter alia*, enter into the Rollout Agreement provided that EPC met the Performance Criteria.

25.    The Phase 1 License Agreement explicitly states that the Parties agree to "be legally bound" by the terms of their agreement.  [License Agreement, pg. 1; see also Section 12 (Binding Effect; Entire Agreement).]

26.     Defendants' Senior Vice President of Marketing, Mary Kellmanson, executed the Phase 1 License Agreement on behalf of Winn-Dixie.

27.     On or about October 24, 2012, prior to the execution of the Phase 1 License Agreement, EPC provided Defendants a copy of EPC's standard Rollout Agreement at a meeting between EPC and Winn-Dixie at Winn-Dixie's Jacksonville, Florida headquarters.

28.     Additionally, the terms of the Rollout Agreement are nearly identical to those contained in the Phase 1 License Agreement.

29.     Subsequently, at Defendants' request, EPC provided Defendants with a copy of a rollout agreement in force at another retailer, the material terms of which did not vary from the Rollout Agreement provided earlier to Defendants.

30.     The Rollout Agreement has a 5-year term.  EPC discussed the necessity of the 5-year term with Winn-Dixie prior to the execution of the License Agreement, explaining that the 5-year term enables EPC to re-coup the significant start-up capital investment and costs it would incur during the Program pilot and rollout.

31.     Accordingly, Winn-Dixie was aware of, and agreed to, the material terms of the standard Rollout Agreement at the time it executed the Phase 1 License Agreement.

32.     In connection with Phase 1 of the myDEALS Program, EPC agreed to provide significant resources to Winn-Dixie in reliance on the promise of entering into the Rollout Agreement if certain Performance Criteria were met.  [License Agreement, Section 3 (EPC Phase 1 Responsibilities).]

33.     For example, EPC was responsible for providing and installing an Activation Station at each store involved in Phase 1 of the myDEALS Program.  [Id.]

34. Pursuant to the License Agreement, Phase 1 of the Program was to be immediately followed by a 30-day period during which evaluation of Phase 1 under the Performance Criteria (the "Evaluation Period") was to occur. [License Agreement, Section 6 (Term Of The Agreement).]

35. During this 30-day Evaluation Period, "subject to Phase 1 being deemed a 'success' according to the Performance Criteria … a Rollout Agreement shall be executed …" [License Agreement, Section 6 (Term Of The Agreement)(emphasis added).]

36. Winn-Dixie further agreed that, "during the Evaluation Period, Winn-Dixie will review the Program with EPC and evaluate, in good faith, the success of the Program during [Phase 1] according to the following … [Performance Criteria]":

> (1) EPC Technology Performance – Activation Stations and associate software operated reliably …
>
> (2) EPC Service Performance – EPC preformed service requirements … and data & software management in a professional and timely manner …
>
> (3) Program Acceptance – The average percentage of cardholding shopping households who accessed Activation Stations ("Activating Households") across all Phase 1 [s]tores exceeded [7%].

[License Agreement, Section 7 (Phase 1 Implementation Evaluation)(emphasis added).]

**C. EPC Meets the Performance Criteria and the Parties Orally Agree to Expand the Rollout**

37. Phase 1 of the myDEALS Program took place between July 31 and October 22, 2013 in 11 Winn-Dixie stores in and around Baton Rouge, Louisiana.

38. Deborah Shapiro, Defendants' Manager of Loyalty Sales and Marketing, reported to EPC that on or about September 12, 2013 Henry Ferris, Defendants' Vice President of Sales and Marketing, visited Baton Rouge pilot stores and interviewed Winn-Dixie personnel

including store managers and the district manager to evaluate the myDEALS pilot.  Ms. Shapiro reported that Mr. Ferris was "very pleased" with the myDEALS pilot.

39.    Defendants had previously designated Ms. Shapiro as EPC's contact person with respect to the myDEALS Program.

40.    In September 2013, EPC was notified that Defendants would make a decision on the Rollout Agreement before the end of that month.

41.    On or about October 1, 2013, Ms. Shapiro asked EPC how quickly EPC could install myDEALS Activation Stations in all BI-LO stores (including Winn-Dixie, Harvey's, and Bi-LO branded grocery stores).

42.    On multiple occasions following the completion of Phase 1, EPC reported to Ms. Shapiro that EPC had met the Performance Criteria.

43.    Defendants acknowledged on multiple occasions that EPC had met the Performance Criteria.

44.    During the Evaluation Period, Defendants never indicated to EPC that EPC had failed to meet any of the Performance Criteria.

45.    Indeed, to date, Defendants have never indicated to EPC that EPC failed to meet the Performance Criteria.

46.    In fact, EPC met all of the Performance Criteria.

47.    Additionally, EPC has met all of its obligations under the License Agreement.

48.    On or about October 16, 2013, Ms. Shapiro notified EPC that Defendants' Mr. Ferris (the named executive to receive notifications under the Phase 1 License Agreement) and Ms. Kellmanson (the executive who was signatory to the Phase 1 License Agreement) had

finalized the decision to move forward with a Chainwide Rollout that would include all Winn-Dixie, Harvey's, and Bi-LO stores.

49.     Immediately following Defendants' decision to move forward, Defendants discussed with EPC a timeline for Chainwide Rollout in detail.  The Parties discussed a plan to execute in Winn-Dixie and Harvey's branded stores between February and June 2014 and to execute in Bi-LO branded stores in North and South Carolina between July and September 2014.

50.     At this time, BLH, Bi-LO, LLC, Harvey's and EPC entered into an oral modification of the Phase 1 License Agreement, in which they agreed to expand the scope of the Rollout Agreement to include Defendants' other grocery stores, branded as Bi-LO and Harvey's.

51.     The Parties agreed upon and accepted the terms of the oral modification of the License Agreement.  They were aware of the material terms of the standard Rollout Agreement at the time they expanded the scope of the License Agreement.

52.     In or about October 2013, EPC installed an Activation Station in the Tamarac, Florida Winn-Dixie store in time for the store's re-opening at Ms. Shapiro's specific request. The Tamarac store is outside of the scope of the Phase 1 pilot.

53.     On or about October 31, 2013, Ms. Shapiro indicated that Defendants' Executive Vice President Lawrence Stablein was travelling, so Defendants had not yet approved the start date for the Chainwide Rollout.

54.     On November 20, 2013, EPC formally presented its Phase 1 results to Defendants' Senior Vice President and Chief Merchandising Officer Bill Nasshan.  Ms. Shapiro and Mr. Ferris also attended the presentation.  At that time, EPC was told by Ms. Shapiro that

Ms. Kellmanson was "on board" with near-term execution of the Chainwide Rollout of myDEALS and that, accordingly, there was no need for her to attend the meeting.

55.     In or about November 2013, Ms. Shapiro informed EPC that approval of Chainwide Rollout had been confirmed by BLH's "Executive Committee" (on information and belief, Ms. Kellmanson and Mr. Stablein were both members of the Executive Committee at that time), with the start date forthcoming.

56.     Subsequently, Defendants told EPC that Mr. Stablein had temporarily put the start date of the Chainwide Rollout "on hold" until Winn-Dixie successfully completed its merger with retail stores it had recently acquired.

57.     Defendants and Plaintiff had a working understanding that rollout of myDEALS would follow the resolution of the merger operations.

58.     Beginning in or about December 2013, Defendants requested that EPC further extend its myDEALS Program beyond the scope of the Phase 1 pilot.  In addition to the Tamarac, Florida Winn-Dixie store installed in October 2013, EPC was requested to install an additional 66 stores, spanning Winn-Dixie, Harvey's and Bi-LO branded stores.

59.     On December 4, 2013, Ms. Shapiro told EPC to begin preparations for executing the myDEALS Program in Harvey's branded stores, with deployment beginning on or about March 2014.

60.     At this time, Ms. Shapiro also told EPC that Defendants were working towards scheduling deployment of more (non-Harvey's) stores to the myDEALS Program following completion of Defendants' integration of the Harvey's stores.

61.     On or about December 11, 2013, Ms. Shapiro stated that BLH was looking to rollout the myDEALS Program to some of Defendants' Bi-LO branded stores.  She asked EPC

to send her a design for Activation Stations to be installed in Bi-LO branded stores. Defendants' Bi-LO branded stores are outside of the scope of the Phase 1 pilot.

62. On December 10, 2013, Defendants approved a memorandum being sent under Mr. Nasshan's and Mr. Ferris's names to CPGs serving Winn-Dixie stating that "[w]e are very pleased with the myDEALS results and are now working toward program expansion and a timetable, beginning with [Harvey's branded stores] this winter."

63. By way of background, BLH acquired Harvey's from Food Lion (Delhaize USA). At the time of the acquisition, Food Lion and EPC had a contract for a program similar to Defendants' and EPC's myDEALS Program.

64. In or about February 2014, EPC implemented myDEALS at a Georgia Bi-LO branded store at the request of Mr. Ferris and Ms. Shapiro. Again, this particular store was outside of the scope of the Phase 1 pilot.

65. That same month, EPC installed an Activation Station in the lobby of BLH's and Winn-Dixie's Jacksonville headquarters at the request of Ms. Shapiro.

66. On March 12, 2014, Defendants' Vice President of General Merchandise/HBC Sales, Dewayne Rabon, emailed EPC that he had spoken with Mr. Ferris and that "[the] Harvey's [brand] is staying in place at this time, so we will continue with their program as is. As for Winn-Dixie, it has not been cancelled, but it has been put on hold while we pull in the Delhaize stores onto the BI-LO holdings platform… Bill [Nasshan] and I briefly discussed, but I will circle back with him when I see him on Thursday."

67. In or about April 2014, myDEALS was featured as one of the top initiatives at BLH's Supplier Summit of big ideas. At the Supplier Summit, myDEALS was identified as an initiative for "fast-track implementation."

68.     On or about April 17, 2014, EPC met with Mr. Stablein and Mr. Rabon as a follow-up to the Supplier Summit.   Mr. Stablein asked EPC to be patient on a rollout announcement date, as a number of things were happening at Defendants, including the ongoing integration of the previously acquired stores and the hiring of a new Vice President of Digital Marketing.

69.     In or about May 2014, based on Defendants' previous direction, EPC completed conversion of the EPC/Food Lion Program in sixty-two (62) acquired Harvey's stores to EPC's/Defendants' myDEALS Program, so that Harvey's shoppers would, in the words of the Defendants, experience a "seamless transition."   (Fifty-five of the Harvey's stores remained branded as Harvey's, and seven (7) of the Harvey's stores were re-branded as Winn-Dixie.) These Harvey's and Winn-Dixie branded stores are outside of the scope of the Phase 1 pilot.

70.     At about this same time, Defendant requested that EPC install the myDEALS program in an additional three (3) Winn-Dixie stores which had been converted by Defendants to Harvey's stores.

71.     On or about May 19, 2014, EPC met with Bert Dumars, Defendants' new Vice President of Digital Marketing, and Defendants' Senior Director of Strategic Sourcing, Brett Mauser, pursuant to moving forward with the Rollout Agreement.   Mr. Dumars was positive and endorsed myDEALS and the role of "paper offers" in-store as part of an overall digital strategy.

72.     Upon information and belief, Mr. Stablein left Defendants' employ approximately 2 weeks after the April 17, 2014 meeting with EPC.

73.     Upon information and belief, Ms. Kellmanson became the sole head of Defendants' Marketing Department following Mr. Stablein's departure.

**D. Defendants Refuse To Rollout myDEALS**

74. Beginning in or about June 2014, Defendants suddenly began making demands that EPC agree to make changes to the Rollout Agreement. Defendants also began expressing reservations about implementing the Chainwide Rollout that had nothing to do with the Performance Criteria.

75. In or about June 2014, while EPC was in talks with Defendants to finalize the rollout, Defendants requested that EPC change the myDEALS Program, asking EPC to scrap EPC's coupon targeting engine and replace it with Coupons, Inc.'s targeting engine, an engine which had not been deployed in a retail chain. Upon information and belief, Defendants had recently entered into a contract with Coupons, Inc.

76. EPC offered to coordinate its targeting with Coupons, Inc. to address Defendants' purported concerns. Coupons, Inc. informed EPC that it could begin to work with EPC on achieving this coordinated targeting beginning on July 1, 2015. EPC then informed Defendants that Coupons, Inc. was willing to work with EPC beginning on said date. Defendants responded to EPC by insisting that EPC "take the risk" and contractually guarantee that the coordination effort be complete by June 30, 2015 – the day before Coupons, Inc. would agree to begin to work with EPC on the project.

77. In or about July 2014, with Mr. Mauser's approval, Defendants' Director of Consumer Insights & Loyalty Marketing, Erik Haines, picked up discussions with EPC while Ms. Shapiro took a planned maternity leave. At that time, Mr. Haines told EPC that Ms. Kellmanson had reservations and was holding up the myDEALS rollout.

78. Although the Phase 1 Evaluation Period had concluded many months earlier, prior to June 2014 Defendants had never theretofore communicated to EPC that Defendants had

any reservations about proceeding with the Chainwide Rollout – it was simply a matter of scheduling the start date.

79. In or about August, 2014, Mr. Haines identified three purported reservations by Ms. Kellmanson: (1) she wanted shoppers to receive offers targeted through a single targeting engine; (2) she believed in “pure digital” and did not want to introduce any new “paper” into stores, and (3) she did not believe EPC’s data showing that Winn-Dixie pilot stores had enjoyed a sales lift during Phase 1 of the myDEALS Program.

80. None of the reservations identified by Mr. Haines has anything to do with the Performance Criteria.

81. EPC answered each and every purported reservation of Ms. Kellmanson through her subordinates, since Ms. Kellmanson refused to meet or communicate directly with EPC, despite EPC’s continued efforts to meet or otherwise communicate with her directly.

82. In or about September, 2014, EPC provided talking points to Mr. Haines responsive to Ms. Kellmanson’s reservations, and he agreed to go to Ms. Kellmanson “one last time” to lobby for rollout. EPC asked again to meet with Ms. Kellmanson. Although EPC had not yet met with Ms. Kellmanson, Mr. Haines indicated that an EPC meeting with her was not likely.

83. EPC has not been given an opportunity to meet with or otherwise speak directly to Ms. Kellmanson to date.

84. EPC has repeatedly reached out to Defendants with respect to the Chainwide Rollout and has offered to make certain concessions to Defendants in connection with the rollout.

85. At all times, EPC has acted in good faith.

86. All efforts by EPC to work with Defendants were ultimately rebuffed by Defendants.

87. Defendants have subsequently indicated to EPC that they will not sign the Rollout Agreement.

88. Defendants have proffered the explanation that they have decided to go in a "different direction" with their marketing efforts.

89. Defendants have failed to act in good faith with respect to the Chainwide Rollout.

90. Defendants are acting in bad faith with respect to the Chainwide Rollout.

91. To date, EPC has expended in excess of $1 million in costs on the myDEALS Program since the execution of the Phase 1 License Agreement.

92. EPC's Activation Stations remain in Defendants' stores.

93. EPC has provided a benefit to Defendants, by among other things, increasing retail sales for Defendants by implementing EPC's myDEALS Program in Defendants' stores.

94. EPC has suffered lost profits in excess of $75,000 as a result of Defendants' breach of the License Agreement and refusal to follow through with the Chainwide Rollout.

**COUNT I**
**(EPC v. Winn-Dixie)**
**Breach Of Written Contract**

95. EPC hereby repeats the preceding paragraphs as if more fully set forth at length herein.

96. Plaintiff and Winn-Dixie entered into the written Phase 1 License Agreement whereby Winn-Dixie agreed to, *inter alia*, enter into the Rollout Agreement provided that Plaintiff met the Performance Criteria.

97. EPC met the Performance Criteria and otherwise satisfied all of its contractual obligations to Winn-Dixie.

98. Winn-Dixie subsequently affirmed that it was authorizing a Chainwide Rollout, including all Winn-Dixie branded stores, and began to implement the Chainwide Rollout.

99. Winn-Dixie has failed to enter into the Rollout Agreement and has notified Plaintiff that it will not be entering into a Rollout Agreement.

100. As such, Winn-Dixie has materially breached the License Agreement.

101. Additionally, Winn-Dixie has breached the implied covenant of good faith and fair dealing in connection with the License Agreement by, *inter alia*, refusing to discuss entering into a Rollout Agreement with Plaintiff, despite Winn-Dixie's obligation to do so.

102. Plaintiff has suffered damages as a result of such breach, the value of which as of the date hereof is in excess of $75,000, excluding court costs, attorneys' fees and subsequent charges.

WHEREFORE, Plaintiff hereby demands judgment against Winn-Dixie for the following relief:

a. compensatory damages;

b. prejudgment interest thereon at the contractual rate from the date of default;

c. attorneys' fees and cost of suit; and

d. for such other and further relief that the Court deems equitable and just under the circumstances.

**COUNT II**
**(EPC v. BLH, Bi-LO, LLC, and Harvey's)**
**Breach of Oral Contract**

103. Plaintiff hereby repeats Paragraphs 1 through 102 as if more fully set forth at length herein.

104. Plaintiff, BLH, Bi-LO, and Harvey's agreed to an oral modification of the License Agreement to, *inter alia*, expand the scope of the Rollout Agreement to include Bi-LO and Harvey's stores.

105. The Parties agreed upon and accepted the oral modification of the Phase 1 License Agreement. They seriously understood and intended to be bound by the oral modification. Both Parties performed consistent with the oral modification.

106. BLH, Bi-LO, and Harvey's began to implement the Chainwide Rollout.

107. At the direction of BLH, Bi-LO, and Harvey's, EPC installed Defendants' myDEALS Program in Harvey's and Bi-LO stores.

108. EPC created a new design for its Activation Stations for Bi-LO stores at the direction of BLH, Bi-LO, and Harvey's.

109. BLH, Bi-LO, and Harvey's have failed to enter into the Rollout Agreement with Plaintiff and have notified Plaintiff that they will not be entering into a Rollout Agreement.

110. As such, BLH, Bi-LO, and Harvey's have materially breached the oral contract.

111. Additionally, BLH, Bi-LO, and Harvey's have refused to discuss entering into a Rollout Agreement, despite BLH, Bi-LO, and Harvey's obligation to do so.

112. Due to EPC's performance under the License Agreement, the Defendants received and accepted a benefit that they were not otherwise entitled to under the original written agreement.

113. It would work a fraud upon either party to refuse to endorse the oral modification.

114. Plaintiff has suffered damages as a result of such breach, the value of which as of the date hereof is in excess of $75,000, excluding court costs, attorneys' fees and subsequent charges.

WHEREFORE, Plaintiff hereby demands judgment against BLH, Bi-LO, LLC, and Harvey's, jointly and severally, for the following relief:

a. compensatory damages;

b. prejudgment interest thereon at the contractual rate from the date of default;

c. attorneys' fees and cost of suit; and

d. for such other and further relief that the Court deems equitable and just under the circumstances.

**COUNT III**
**(EPC v. All Defendants)**
**Specific Performance of Agreement (In The Alternative)**

115. Plaintiff hereby repeats Paragraphs 1 through 102 as if more fully set forth at length herein.

116. Plaintiff and Defendants entered into the License Agreement and agreed to be bound to execute the Rollout Agreement in the event the Performance Criteria were met in the pilot.

117. Defendants subsequently affirmed that they were entering into the Rollout Agreement, authorized a Chainwide Rollout, and began to implement the Chainwide Rollout.

118. Defendants have failed to enter into the Rollout Agreement or fully implement the Chainwide Rollout and have notified Plaintiff that they will not be entering into a Rollout Agreement or implementing the Chainwide Rollout.

119. As such, Defendants have materially breached the License Agreement.

120. Additionally, Defendants have refused to further discuss entering into a Rollout Agreement or implementing a Chainwide Rollout with Plaintiff, despite Defendants' obligation to do so.

121. Plaintiff is clearly entitled to specific performance of those agreements, whereby Defendants must abide by the terms of the License Agreement, and enter into the Rollout Agreement and otherwise implement the Chainwide Rollout.

122. There is no adequate remedy at law.

123. Justice requires specific performance of the agreements.

WHEREFORE, Plaintiff hereby demands judgment against all Defendants, jointly and severally, for the following relief:

a. specific performance of the agreements;

b. attorneys' fees and cost of suit; and

c. for such other and further relief that the Court deems equitable and just under the circumstances.

**COUNT IV**
**(EPC v. All Defendants)**
**Promissory Estoppel (In The Alternative)**

124. Plaintiff hereby repeats Paragraphs 1 through 102 as if more fully set forth at length herein.

125. Defendants expressly promised that they would, *inter alia*, rollout Plaintiff's myDEALS Program in all of Defendants' stores so long as Plaintiff met the Performance Criteria and provided Defendants with certain goods and services.

126. Defendants made the aforementioned promises with the reasonable expectation that such promises would induce Plaintiff to rollout Plaintiff's myDEALS Program in all of Defendants' stores so long as Plaintiff met the Performance Criteria.

127. As a result of the aforementioned promises by Defendants, Plaintiff provided Defendants with certain goods and services free of charge and expended in excess of $1 million in the course of providing Defendants with same.

128. Nevertheless, Defendants have not rolled out Plaintiff's myDEALS Program and have stated that they refuse to do so.

129. The injustice of forfeiting compensation for providing Defendants with certain goods and services performed at the direction of Defendants can only be avoided by enforcement of the promises made by Defendants to enter into the Rollout Agreement.

WHEREFORE, Plaintiff hereby demands judgment against all Defendants, jointly and severally, for the following relief:

a. compensatory damages;

b. attorneys' fees and cost of suit; and

c. for such other and further relief that the Court deems equitable and just under the circumstances.

**COUNT V**
**(EPC v. All Defendants)**
**Unjust Enrichment (In The Alternative)**

130. Plaintiff hereby repeats Paragraphs 1 through 102 as if more fully set forth at length herein.

131.     Plaintiff conferred a benefit on Defendants by providing Defendants with certain goods and services.

132.     Defendants knew that Plaintiff was providing Defendants with certain goods and services and that Plaintiff expected that Defendants would rollout Plaintiff's myDEALS Program in all of Defendants' stores so long as Plaintiff met the Performance Criteria.

133,     Defendants voluntarily accepted and retained the benefits of the myDEALS Program rendered by Plaintiff.

134.     It would be patently unjust to allow Defendants to accept and retain the aforementioned benefits conferred on it by Plaintiff without paying Plaintiff for the value of the goods and services provided by Plaintiff.

WHEREFORE, Plaintiff hereby demands judgment against all Defendants, jointly and severally, for the following relief:

  a.     compensatory damages;

  b.     attorneys' fees and cost of suit; and

  c.     for such other and further relief that the Court deems equitable and just under the circumstances.

**JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

March 11, 2015

**DILWORTH PAXSON LLP**

By: ______________________________

Thomas S. Biemer, Esquire
Katharine Hartman, Esquire
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: 215-575-7000
Fax: 215-575-7200
tbiemer@dilworthlaw.com
khartman@dilworthlaw.com